# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| KENOSHA UNIFIED SCHOOL DISTRICT  )<br>)<br>Plaintiff,                          )<br>)<br>v.                                )  Case No. Case No.:<br>)<br>Eric and Sara Vincent, Individually and   )<br>As the parents/guardian of B.V., and B.V. a )<br>Minor.                            )<br>)<br>Defendant.  | |

## COMPLAINT

NOW COMES the Plaintiff, Kenosha Unified School District, by its attorneys, Ronald S. Stadler, SmithAmundsen LLC., and as and for its cause of action against the Defendants, Eric and Sara Vincent, Individually and as the parents/guardian of B.V., and B.V. a Minor.

### NATURE OF THE ACTION

This action arises under 20 USCA §1400 et. Seq., the Individuals with Disabilities Education Act ("the IDEA"). The defendants requested a due process hearing alleging that the Plaintiff denied B.V. a free appropriate public education ("FAPE") in violation of the IDEA. A due process hearing was held and a decision was issued by the Administrative Law Judge on December 4, 2009. A motion for reconsideration was filed by plaintiff on December 22, 2009 and it was denied by the ALJ on January 15, 2010. This is an appeal of both orders.

## JURISDICTION AND VENUE

1. Jurisdiction of this Court is proper pursuant to 28 USC § 1331 and 20 USC §1415.

2. Venue is proper in the Court pursuant to 28 USC § 1391(b) and (c). The Defendants are located in the Eastern District of Wisconsin and the educational services at issue were and are being provided in the Eastern District of Wisconsin.

## PARTIES

3. The Plaintiff, Kenosha Unified School District, is located at 3600 52nd Street, Kenosha, WI 53144. Plaintiff is a body politic organized under Wisconsin law, capable and authorized to sue and be sued.

4. Defendants Eric and Sara Vincent are adult residents of the State of Wisconsin, residing at 5516 Washington Road, # 103, Kenosha, WI 53144. Eric and Sara Vincent are the parents and guardian of B.V.. B.V. is a minor and she resides with Eric and Sara Vincent.

## STATEMENT OF CLAIMS

5. B.V. was born on November 18, 1996

6. Despite a relatively normal early childhood, beginning in second grade B.V. began to experience mental health issues.

7. B.V.'s teachers in Bessemer, Alabama reported that B.V. was talking to herself, talking to imaginary friends and laughing hysterically in class. These behaviors, which were uniformly defined as bizarre, led to B.V. being enrolled in the special education program in Bessemer.

8. Subsequent to her enrollment in the special education program however, state officials suspected that B.V. had been sexually assaulted and she was removed from her home.

9. Defendants Eric and Sara Vincent lost custody of B.V. between 2006 and 2008, during the period of time when B.V. was removed from their home until they brought her to Wisconsin on August 1, 2008.

10. B.V. was first placed at a residential treatment facility known as Brewers Porch. That program, however, was designed for short-term residential treatment and B.V.'s needs exceeded those that could be met at Brewer's Porch.

11. After six months at Brewer's Porch, the State of Alabama removed B.V. from that placement and placed her at Laurel Oaks. Laurel Oaks was another residential treatment facility, although it offered a psychological ward and an on-ground school.

12. During her two year stay at Laurel Oaks, B.V. received little if no education. Although an IEP was drawn up for B.V., due to her violent, uncontrollable and bizarre behaviors she did not attend class.

13. At some point in the summer of 2008, B.V.'s parents initiated a proceeding in the Alabama court system allowing them to regain custody of B.V. in order to move her from Alabama to Wisconsin

14. B.V. did not successfully complete the program at Laurel Oaks.

15. Against the recommendation and wishes of the staff at Laurel Oaks, on July 30, 2008 B.V. was removed from Laurel Oaks and her parents

transported her to Wisconsin. At this time, B.V. was impulsive, attacking peers and staff without warning.

16. On August 1, 2008, immediately upon B.V.'s arrival at the Vincent's home in Wisconsin, they were unable to maintain control of B.V. and she ended up being removed from the home by law enforcement officers and was placed at the State of Wisconsin Winnebago Mental Health Facility for a five day stay.

17. Later again in late August B.V. had to be hospitalized at Children's Hospital of Wisconsin due to her out of control behaviors.

18. During August and September of 2008 B.V.'s parents enrolled her at the Kenosha Unified School District.

19. The District promptly obtained records from Laurel Oaks and spoke to the staff at Laurel Oaks. From this the District was able to determine that B.V. had significant needs.

20. The District was concerned that B.V. had not been in a school setting for nearly three years. Nevertheless, an IEP team, including B.V.'s parents, was convened and an IEP was developed for B.V..

21. It was determined that because of B.V.'s significant needs, her lack of abilities, and the long period of time since she had been in a school setting, it would be nearly impossible to simply bring her back into the regular school environment.

22. The IEP included a starting point of serving B.V. for two hours per week, after school.

23. No one, including B.V.'s parents, disagreed with this IEP.

24. At this point, the Vincents completed a form to allow them to keep B.V. at home in order to receive services in a homebound setting.

25. The District, nevertheless, agreed that it would provide limited services to B.V. in an effort to begin transitioning her back into the school district. Those services involved two hours per week of education at Mahone Middle School but after school hours.

26. B.V.'s parents did not object to this program and in fact, consented to it.

27. B.V.'s first actual day of school was September 22, 2008. That one hour program went off without a hitch.

28. Nevertheless, on B.V.'s second day of school, September 30, 2008 she had a major behavioral explosion.

29. When B.V.'s behavior turns into violent behavior, she bites, kicks and scratches and hits at anyone within arm's distance of her.

30. B.V.'s mother and a teacher at Lance Middle School have been bitten hard enough to break their skin.

31. In this particular incident, B.V.'s father was present and in addition to him, it took two other full grown adults, all of large size, to attempt to restrain B.V..

32. The inability to control B.V. when her behavior turned violent caused great concern among her teachers. In fact, B.V.'s classroom teacher, Mr. Peter Aiello, went to his supervisors and raised concern that he did not think that he had the ability to restrain B.V. when her behavior turned violent.

5

33. Mr. Aiello has received training in non-violent crisis intervention and has years of experience in working with autistic children with behavioral issues.

34. At this point in time, the District contacted Mr. and Mrs. Vincent and asked them if they would agree to keeping B.V. at home until it could determine how to address her behavioral needs.

35. B.V.'s parents consented to keeping her at home until it could determine how to address her behavioral needs.

36. The parties also discussed providing educational services to B.V. at home. Towards this end, Mr. Aiello visited the Vincent's home along with another teacher. After visiting the home, however, Mr. Aiello again expressed his concern that he did not believe that he could control B.V.'s violent behavior and that it would expose himself, other teachers and Mrs. Vincent to potential injury.

37. District requested one of Mr. Aiello's co-teachers, Ms. Sarah Rivers, to teach B.V. at home. She too, despite all of her training, expressed a concern that she would not be able to control B.V.'s violent behaviors.

38. Because of the inability to find a teacher who had the ability to control B.V.'s violent behaviors, the District had several meetings with Mr. and Mrs. Vincent to look at other options for educating B.V..

39. The first option that the parents were presented with was creating a program and placement for B.V. at the Hillcrest School, a specialized school within the Kenosha Unified School District.

40. In order to analyze this program and placement, an IEP team was convened. In addition to all of the educators and employees of the District, the District also included numerous individuals from Kenosha County Social Services and the private entities that contract with Social Services.

41. The group identified in the previous paragraph analyzed B.V.'s needs and the ability to meet those needs at the Hillcrest School and it was determined that that would not be a good placement for B.V..

42. After the meeting concerning the placement at Hillcrest School, Kenosha Social Services suggested to Mr. and Mrs. Vincent that they sign a voluntary CHIPS proceeding and utilize the county's resources to obtain a residential treatment placement for B.V..

43. The Vincents asked for time to consider this potential residential placement, and they discussed it for "a few months

44. The District did not provide services to B.V. while it was waiting to learn whether the Vincents would utilize the CHIPS proceeding. Nevertheless, after the meeting at Hillcrest, the District sent a consent for services form to Mr. and Mrs. Vincent on October 10, 2008, asking them to consent to an evaluation of B.V..

45. During this period of time, the Vincents were apparently considering whether to place B.V. in a residential treatment center through the county's recommended CHIPS proceeding. Accordingly, between October 10, 2008 and November 12, 2008 the Vincents did not provide consent for the District to conduct an evaluation of B.V..

46. On November 12 Mrs. Vincent did sign the consent form to allow the District to complete an evaluation.

47. In October, November and December of 2008 B.V. began to receive services from Children's Behavioral Health Services. These services were being provided for 40 hours per week for the entire school day.

48. The amount of time was more than is normally devoted to a child by CBHS, but it was viewed as critical for B.V. because of her significant deficits in behavior, interaction and communication.

49. The Vincents did not believe that B.V. needed more hours of services during this period. Nevertheless, despite a full time behavioral program, B.V. continued to have behavioral problems at home during this period.

50. Virginia Smith, the lead therapist for CBHS identified that between September and December 2008, B.V.'s behaviors remained random and there was no improvement. She was also not able to determine the antecedents of B.V.'s behavior.

51. Although CBHS saw some improvements in B.V.'s behavior in terms of a reduction in duration and frequency from January through March 2009, in April there was an increase, and even a need to involve a rescue squad.

52. It has only been since May 2009 that Ms. Smith has seen a decrease in the severity and duration of B.V.'s behavioral explosions.

53. During October and November the Vincents were also interested in enrolling B.V. in a program at the National Institute of Health. That program was designed to address children who have mental health needs

and it was expected that B.V., would be allowed into that program for at least a twelve week period of time.

54. B.V. had a violent behavioral explosion in front of the NIH staff. Because of this violent behavioral explosion, B.V. was not allowed to join the NIH program and she returned to Wisconsin with her parents in early December.

55. When it became apparent to Kathy Lauer, Director of Special Education at the District, that B.V. would not be placed in a residential treatment program and that she was not going to qualify for the NIH program, Ms. Lauer realized that the District would not be able to complete an evaluation of B.V. within 60 days of November 12, 2008.

56. Accordingly, on January 6, 2009 Ms. Lauer sent a request to the Vincents for an extension of time to complete the evaluation. Although the Vincents received that form, they did not contact the District to indicate their consent to the extension nor did they contact the District to express any concerns or dissatisfaction with the fact that an extension would be necessary.

57. Between January and April of 2009, the District assembled an incredible number of individuals to conduct testing, diagnostic services and other evaluations of B.V. in order to attempt to understand how to control her behavior.

58. In fact, this staffing team was one of the largest staffing teams the District has ever assembled.

59. During the period of time when the District was evaluating B.V., it was also sending teachers and therapists into the Vincent home to meet with the CBHS therapists.

60. The District was utilizing Virginia Smith from CBHS to coordinate the evaluations because Ms. Smith had developed a rapport with B.V..

61. The purpose of the home visits was to evaluate B.V. and also to provide educational strategies and materials that the line workers could utilize to help introduce academic portions to B.V.'s instruction.

62. The primary focus of B.V.'s treatment was still behavioral because without addressing the behavioral component there could be no academic access, but District teachers and staff were providing materials and suggestions for academic and school-related work.

63. During the same period of time, B.V.'s parents were receiving on-going psychotherapy treatment for B.V. from the Shorewood Psychological Clinic.

64. Additionally, they took B.V. to the Weisman Center in Madison on two occasions for evaluations.

65. Additionally, B.V. was placed at the Mayo Clinic for three weeks in April and May of 2009 for another evaluation.

66. Despite the fact that the Vincents received evaluation reports from the Weisman Clinic and the Mayo Clinic, those were never shared with the school district, notwithstanding the District's request to receive them.

67. In April of 2009 the District's evaluations for the purpose of conducting an IEP team meeting about B.V. were completed, but the evaluation meeting was delayed to allow B.V.'s parents to take her to the Mayo Clinic.

68. At the May 11, 2009 IEP meeting, the District IEP members continued to believe that it was not appropriate to bring B.V. into school and that instead she should receive services over the summer, preparing her to enter school in the fall of 2009.

69. The Vincents and their advocate strongly objected to this and demanded that B.V. be enrolled in school immediately.

70. The IEP team considered the family's concerns and desires and developed a program that would transition B.V. back into the school day for two hours per day, then three hours per day, and then four hours per day based upon her ability to handle the increases.

71. B.V. was immediately placed into the Kenosha Special Education Program and despite her previous placement at Mahone Middle School, this placement was designed for Lance Middle School.

72. B.V. continued to experience her behavioral explosions and within two weeks of being reenrolled in school, she had a behavioral explosion wherein she bit her teacher hard enough to break the teacher's skin and require the teacher to seek medical attention in the emergency room.

73. Because of this outburst, B.V. was changed from a four hour placement back to a three hour placement, a period of time that the District thought that B.V. could better handle. B.V. finished the school year in this three hour per day placement.

74. On May 27 the District held a phone conference with Mrs. Vincent to complete a Functional Behavioral Assessment and develop a Behavioral Intervention Plan (BIP).

75. Mrs. Vincent was told that if she was unhappy with the BIP she could have it reviewed at another IEP meeting.

76. B.V.'s 2009-10 school year placement continued under the May 2009 IEP, with a placement of 3 hours per day.

77. On or about June 10, 2009 the defendants requested a due process hearing, alleging that B.V. had been denied a FAPE.

78. Defendants alleged in their hearing request that the 2008-09 and 2009-10 IEPs were substantively deficient.

79. Defendants alleged in their hearing request that B.V. was not being educated in the least restrictive environment.

80. Defendants alleged in their hearing request that B.V. should be receiving extended school year services.

81. Defendants alleged in their hearing request that B.V. should be provided with an independent educational evaluation.

82. Defendants alleged in their hearing request that the functional behavioral assessment and behavior intervention plan developed for B.V. were inadequate.

83. Defendants alleged in their hearing request that B.V. was entitled to compensatory education.

84. In response to the hearing request, the Plaintiff filed an objection with the ALJ, pursuant to 34 CFR § 300.502 requesting a more definite complaint

from the parents. The basis of the District's objection was that the parents did not adequately set forth the nature of the problems and they did not identify a proposed resolution other than a simplistic request that the District comply with the law and provide compensatory education.

85. The ALJ denied the District's motion.

86. A hearing was held in this matter on September 30 and October 1, 2009.

87. The issues raised by the parents in the hearing included:

    a. Whether the 2008-09 IEP was substantively appropriate;

    b. Whether the 2009-10 IEP was substantively appropriate;

    c. Whether B.V.'s placement was in the least restrictive environment;

    d. Whether the District committed procedural violations;

    e. Whether the functional behavioral assessment and behavior intervention plan developed for B.V. were inadequate; and

    f. Whether Defendants B.V. was entitled to compensatory education.

88. The ALJ issued his decision on December 4, 2009.

89. In that decision the ALJ concluded that:

    a. the 2008-09 IEP was substantively appropriate;

    b. the 2009-10 IEP was substantively appropriate;

    c. the functional behavioral assessment and behavior intervention plan developed for B.V. were adequate;

    d. the District committed procedural violations ;and

    e. B.V. was entitled to compensatory education, to be provided for at least four hours every week, regardless of whether school is in session.

90. On December 22, 2009 the Plaintiff filed a motion for reconsideration, asking the ALJ to reconsider his conclusion that:

   a. The parents had carried their burden of proving that compensatory education was legally or factually required;

   b. There had been any proof to support any findings of what compensatory was necessary or how much compensatory education was necessary;

   c. Compensatory education was required to be provided every week, regardless of whether school was in session.

91. On January 15, 2009 the ALJ issued an order denying the motion for reconsideration.

Cause of Action: Review of ALJ's Decision Pursuant to 20 USC §1415

92. Plaintiff re-asserts and re-alleges paragraphs 1 -91 as though more fully set forth herein.

93. The ALJ's decision denying the Plaintiff's motion for a more definite complaint was in violation of 34 CFR § 300.502 in that the defendants did not adequately set forth the nature of the problems and they did not identify a proposed resolution other than simplistic requests that the District comply with the law. The defendants' failure to provide a more definite complaint caused prejudice to Plaintiff.

94. The ALJ's order of December 4, 2009 was in contrary to the IDEA, contrary to the record and prejudiced the District by:

   a. Concluding that any procedural violation caused substantive harm to B.V.;

b. Concluding that compensatory damages are available to remedy a purely procedural violation;

c. Concluding that the record supported a finding that B.V. lost education benefit;

d. Concluding that the defendants met their burden of proof that compensatory education is necessary for B.V.;

e. Awarding compensatory education when there was no evidence in the record to support a finding of what compensatory education would be appropriate or how much what compensatory education would be appropriate, and when there were no facts in the record by which the ALJ could exercise discretion;

f. Ordering that compensatory education be provided for at least four hours per week, every week, regardless of whether school is in session.

95. The ALJ's order of January 15, 2010 denying the Plaintiff's motion for reconsideration was contrary to the IDEA, contrary to the record, void of the exercise of discretion and prejudiced the District.

WHEREFORE, Plaintiff prays for this Court to issue an order:

A. Finding that the ALJ's award of compensatory education is contrary to the IDEA;

B. Finding that the ALJ's order denying the Plaintiff's motion to make the complaint more definite is contrary to the IDEA;

C. Finding that the ALJ's order denying the Plaintiff's motion for reconsideration is contrary to the IDEA;

D. Dismissing Defendants' due process request;

15

E. For such further and other relief as may be just or equitable.

DATED this 18th[th] day of January, 2010

        SmithAmundsen LLC

By:     /s/ Ronald S. Stadler
        Ronald S. Stadler, State Bar No. 1017450

<u>MAILING ADDRESS</u>
4811 South 76th Street, Suite 306
Milwaukee, WI 53220
(414) 282-7103
(414) 282-1830 (fax)